[No. 29832.   Department Two.   June 14, 1946.]

DANIEL J. LUBIN, *a Minor, by Adeline Lubin Goldstein, his Guardian, Appellant,* v. HOLLIS D. COWELL *et al., Respondents.*[1]

[1]Reported in 170 P. (2d) 301.

*Bernard L. Swerland,* for appellant.

*Hamblen, Gilbert & Brooke,* for respondents.

JEFFERS, J.—This action was instituted by Adeline Lubin Goldstein, as general guardian of Daniel Lubin, a minor, against Hollis D. Cowell, doing business as Babcock Motors, for the purpose of obtaining the return of the purchase price of a Packard sedan automobile, claimed to have been paid by Daniel Lubin to Babcock Motors.

The right to the return of the purchase price of the automobile is based upon the allegations that, at the time of the purported sale, Daniel Lubin was a minor of the age of twenty years; that, prior to the institution of this action, the minor, in writing, disaffirmed the contract and returned the car to defendant, asking for a return to him of the money paid. As a second ground for granting the relief asked by plaintiff, it is alleged that, at the time of the sale, defendant represented that it was the owner of the full unencumbered legal title to the car; that, in reliance upon such representation, plaintiff paid to defendant the sum of $1,539.85 for the purchase of the full unencumbered legal title to the automobile; that such representation was false, in that defendant was not at the time of the sale the

owner of the full unencumbered title, of all of which defendant was aware.

It may be stated here that, by agreement of counsel, John R. Babcock was made a party defendant.

By appropriate denials, the defendants put in issue the question of the minority of Daniel Lubin and the question of any claimed false representation by defendants in regard to the title to the car, and, by cross-complaint, defendants alleged that, on or about December 14, 1944, after Daniel Lubin had used the car for about two and one-half months and had driven it many miles, he returned the car to Babcock Motors for repairs; that defendant Babcock Motors furnished labor and material in making such repairs of the value of $112.48. It is further alleged that such repairs were completed on December 23, 1944, and Daniel Lubin was so notified, whereupon, on the last-named date, Daniel Lubin attempted to disaffirm the contract and requested a return of the purchase money paid. Defendant Babcock Motors asked judgment against plaintiff for the sum of $112.48, as the reasonable value of such repairs, and for the further sum of fifty cents a day storage on the car from December 23, 1944.

The reply denies the affirmative allegations of the cross-complaint.

The cause came on for hearing before the court on May 22, 1945, and, after evidence had been introduced, the trial court made and entered findings of fact, conclusions of law, and judgment favorable to defendants.

Daniel Lubin was born July 19, 1924, and so, at the time of sale of the car here involved, September 30, 1944, was twenty years of age.

Plaintiff's exhibit No. 2, which is designated "New Car Order," shows the total purchase price of the car to be $1,539.85. On the face of the order is written the word "cash." The order contains, among others, the following statement: "I certify that I am 21 years of age or over . . . " The order is signed "Daniel J. Lubin, Roosevelt Apts."

At the time of the alleged sale, Daniel Lubin was a second lieutenant in the air forces, stationed at Gowen Field, Boise, Idaho. At the time of trial, Lubin had been in the army about two and one-half years and, prior to that time, had been a student at Lewis & Clark high school.

All of Mr. Lubin's dealings relative to this car were had with Hollis D. Cowell, who was the manager of Babcock Motors, the owner being John R. Babcock, who, at the time of the transaction, was in the navy. Mr. Cowell first saw Lubin some two or three days before the automobile was purchased. While Mr. Cowell had no personal acquaintance with Mr. Lubin's family, he had had some business dealing with Mr. Goldstein, Daniel Lubin's stepfather.

Mr. Lubin first came into Babcock Motors' place of business, inquiring for the type of car here involved. Defendant had this 1941 Packard in the shop and was reconditioning it. Mr. Lubin was in and out of the place no less than a dozen times, apparently watching the work being done on the car. When the work was completed, on September 30, 1944, Lubin came in and took the car out on the road for a couple of hours. Mr. Cowell stated that he did not pay any particular attention to Lubin, but that he saw him go by with his family in the car.

It may be stated here that Lubin denied that he had the family in the car before it was purchased, or that his mother knew anything about his purchase of the car prior to or at the time of the purchase.

Mr. Lubin at no time, until the letter disaffirming the contract was written, stated to Mr. Cowell that he was not of age. Mr. Cowell stated that he had no conversation with any member of Lubin's family prior to the purchase of the car, and no discussion ever took place between Lubin and Cowell relative to Lubin's age, Mr. Cowell assuming that he was of age.

After Lubin had taken the car out to try it, he came back with a check made out to Babcock Motors for the amount of the purchase price, which check was signed by Ben Goldstein, Lubin's stepfather.

Mr. Goldstein testified that, close to noontime on Saturday, September 30th, Lubin rushed into his store and told him he had bought a car, and he wanted a check for fifteen hundred and some dollars; that Mr. Goldstein asked Lubin if he had talked it over with his mother, and he (Lubin) said he had not; that Mr. Goldstein and Lubin discussed the matter and decided that, in view of Mrs. Goldstein's physical condition, it would not be advisable to tell her about the deal. Mr. Goldstein then made out his personal check for the amount of the purchase price and gave it to Lubin, who took it to Mr. Cowell.

Daniel Lubin had some money, but no checking account. Mrs. Goldstein was Lubin's general guardian, and apparently Lubin's money was under the control of his guardian. It was Lubin's idea that his stepfather would be reimbursed from funds in the guardianship estate, and he so informed Mr. Goldstein.

The court asked Mr. Goldstein the following question:

"THE COURT: Ben, do you believe if you had said 'No' that the boy would have bought that car? A. Well, I don't think so, Judge."

Mr. Goldstein further stated that he discussed this matter with his wife after he went home, and that she was angry about it. However, it appears from Goldstein's testimony that he was later reimbursed by Mrs. Goldstein, the general guardian, from the minor's funds.

We quote from the cross-examination of Mr. Goldstein:

"Q. You were reimbursed later on? A. I was. Q. Out of the boy's money? A. Out of the boy's money. Q. From the guardianship? A. Yes. Q. Was it your understanding at the time that you signed this check that you would be reimbursed? A. Well, I knew there was some money was going to come in, which would more than off-set this amount, and Dan told me that I could deduct it, and he would see that I would get my money."

Plaintiff's exhibit No. 2, as stated, was the order signed by Lubin for the car. It is designated a new car order. It appears from the testimony that there are certain statements in the order which do not apply to a sale of a used

car and do not apply when a car is sold for cash, as this car was, and this Mr. Cowell admitted; but he stated that the statement contained therein, that the purchaser was twenty-one years of age or over, would apply to this sale.

We may say here that we do not think any man of ordinary intelligence would be confused by this order.

Mr. Cowell stated that he handed the order to Dan, who studied it over and signed it. It may be further stated that after the sale, and about 1:30 p. m. of September 30th, Lubin left for Gowen Field, but, before he left, he told his mother about this deal.

We shall now refer to some of the testimony relative to plaintiff's claim that defendants falsely represented to plaintiff that Babcock Motors was the owner of "the full unencumbered legal title" to the car.

About October 16, 1944, Mr. Lubin received from the department of licenses what is termed "Title Suspense Statement," plaintiff's exhibit No. 4. This statement shows:

"Our records show Bernice Hill as co-registered owner on the certificates, yet Lewis Hoyt Hill signed off for her on the reverse side. Please forward a personal release from Bernice Hill, Rt. 2, Port Orchard, Wn., or forward power of attorney from her authorizing Lewis Hoyt Hill to sign for her."

Mr. Cowell testified that they had obtained this car through Commercial Credit Company of the Smith Motor Company in Walla Walla. Mr. Cowell was then asked to explain the situation with reference to getting the issuance of a new title certificate.

"A. In transferring the title, there is several, in some cases, signatures involved. This title to this car, the former owner, it belonged to two different people, or a man and wife, made out, we will say, George Hill and Bernice Hill. I don't know whether that was the right name or not. But I had the title in my possession when I bought the automobile, and when I sold the automobile and after we had sent it in to our state department, and it went through your transfer over here in the county, the license department, and in the license department of the state, they found an error in her signature only. That was all that was wrong in the title, which happens, I dare say, in five *or* [out of] ten

titles we send in the transfer, we find some error in signature. That was the trouble in this case here, and it did take quite a while to get in touch with this said Mrs. Hill. When we did, it was signed off and the state issued the title, as in all other cases, but at no time was there any encumbrance against the automobile from the time I bought it until the time Mr. Lubin got it. Q. Was there ever any claim made by anybody, of a lien or encumbrance on the car? A. There was not."

Mr. Cowell's testimony is not disputed.

We shall next refer to some of the testimony relative to the allegations of defendants' cross-complaint, which involve the repair bill.

Mr. Cowell stated that, after Lubin left with the car on September 30th, he did not see him again until about December 14, 1944, when the car was brought in by Lubin for repairs. Mr. Cowell was asked: "What was the trouble?" At this point counsel for plaintiff made the following objection:

"Just a moment, your Honor. I object to that unless the witness will be qualified and explains how he knows the cause of the trouble. THE COURT: I assume he is going to. First, you had better tell what the trouble was."

We may state here that no further objection was made to any of the following testimony of Mr. Cowell.

"Q. What was the trouble with the car, that needed repair? A. A bearing burnt out. The insert rod bearing, if you know what I am talking about, had burnt out, and considerable driving done after it had burnt out. Q. How could you tell that? A. No man can tell that until he has dropped the crankcase and examined it, or miked the shaft. We can tell to the thousandth of an inch the size of a bearing, or size of a shaft. In this case the bearing, or, in fact, two of them, had been run out long enough to cut the crankshaft itself. When I made my offer or my estimate of around a fifty-dollar price on reconditioning the car, we only thought it was a burnt-out bearing, not knowing the shaft was damaged. After getting into it, we found the shaft damaged. Therefore, the shaft had to be turned to a round size again, which took a good deal longer and more money, of course. Q. Well, now Mr. Cowell, did Mr. Lubin say anything to you about excessive speed in driving?

A. He did. Q. What did he say? A. He told me that he did drive the car on the first trip out, about thirty-five to fifty miles an hour, for approximately one hundred and fifty miles, and, then, got in a hurry and opened it up, and if I may add to this a statement which will clarify my explanation of the deal a little bit: This was not the first trouble Mr. Lubin had with the car after he left my place. This first damage was done on the automobile in some small town in Oregon or Idaho, one or the other, and the mechanic that fixed this bearing temporarily did not have the material to fix it, therefore, he fixed it the best he could and let Mr. Lubin go, and on his way home this damage occurred in this. Q. Well, now, when Mr. Lubin brought it in, you gave him an estimate of around fifty dollars? A. I did. Q. Then, when you got the motor taken down, or whatever you call it, did you advise him further as to what would need to be done? A. Well, as a matter of fact, Mr. Lubin was there at the time we found out what had to be done to the car to make it right. Q. Did you explain to him the additional cost involved? A. We could not explain the exact cost, but we did explain that it would run higher because we did not know at the time how much it would run to fix."

The repairs are itemized on defendants' exhibit No. 7, which Mr. Lubin signed.

Mr. Cowell further testified that the bill was presented to Mr. Lubin, who told Cowell to mail the bill to Mrs. Goldstein, Roosevelt Apts., and she would mail a check.

It was apparently after receiving this bill for $112.48 that Lubin decided to disaffirm his contract, and he then consulted an attorney, and this action was instituted.

The trial court made and entered the following findings of fact and conclusions of law:

"FINDINGS OF FACT:

"III. That heretofore on September 30, 1944, defendant Babcock Motors sold one 1941 Packard Sedan automobile, motor No. D 26520-C and delivered possession thereof to Daniel J. Lubin; that said Daniel J. Lubin made payment therefor in full by check drawn by Ben Goldstein, stepfather of said Daniel J. Lubin, upon the personal account of said Ben Goldstein, who knew of and assisted said purchase by providing his personal check therefor; that thereafter

said Ben Goldstein was reimbursed in said amount from the guardianship estate of Daniel J. Lubin by the mother and general guardian of said Daniel J. Lubin.

"IV. That at the time of the sale of said Packard automobile by defendant Babcock Motors and the delivery thereof to Daniel J. Lubin said Daniel J. Lubin signed a purchase order in which it is stated by said Daniel J. Lubin 'I certify that I am 21 years of age or over.' That on said 30th day of September, 1944, and at the time of the trial said Daniel J. Lubin appeared to be of an age of from 25 to 26 years; that at no time prior to December 23, 1944, did said Daniel J. Lubin advise defendants, or either of them, that he was a minor; that by said written statement, by his appearance, by his conduct, and by his method and manner of doing business with defendants, said Daniel J. Lubin represented himself to defendants to be of full legal age; that said defendants had good reason to believe that said Daniel J. Lubin was of full age and capable of contracting.

"V. That at the time of the sale of said Packard automobile by defendants and delivery thereof to Daniel J. Lubin, said Packard automobile was free and clear of all liens and encumbrances and thereafter on or about January 2, 1945, a title certificate was duly issued and delivered to plaintiff in regular form by the director of licenses, showing title to said Packard automobile in said Daniel J. Lubin, free and clear of all liens and encumbrances.

"VI. That on or about December 14, 1944, after having driven said car over 1800 miles, plaintiff brought said Packard automobile back to defendants' shop and ordered certain servicing and repairs thereto, which said servicing and repairs with the necessary materials therefor were furnished by defendants at the reasonable and agreed price of $112.48, and upon a written order signed by said plaintiff Daniel J. Lubin; that said automobile was thereafter after completion of said repairs left by plaintiff in possession of defendants and defendants were compelled to store the same from December 23, 1944, until July 22, 1945, and the sum of $5.00 per month is a reasonable storage rate to allow defendants for such storage.

"VII. That on December 23, 1944, acting upon the advice of his counsel, plaintiff Daniel J. Lubin attempted to disaffirm said purchase of said 1941 Packard automobile, and for the first time notified defendants that said plaintiff was under 21 years of age."

"CONCLUSIONS OF LAW:

"I. That plaintiff is not entitled to disaffirm said contract of sale of said Packard Sedan automobile, and plaintiff's complaint both as to his first and second causes of action should be dismissed.

"II. That John R. Babcock, doing business as Babcock Motors, as cross-plaintiff, is entitled to recover from plaintiff the sum of $112.48 on account of repairs, and the further sum of $5.00 per month from December 23, 1944 until July 22, 1945, on account of storage of said car, and is entitled to enforce and foreclose a lien on said car for said sums and to recover said sums together with his costs, including a reasonable attorney's fee in the sum of $50.00."

Judgment was entered dismissing both of plaintiff's causes of action, awarding to Babcock Motors, on their cross-complaint, judgment for $112.48 for repairs and the further sum of thirty-five dollars for storage, and ordering that such sums be a lien upon the automobile, and that there be included in the judgment costs as taxed therein, including an attorney's fee of fifty dollars. From the judgment entered, plaintiff has appealed to this court.

There are three questions raised by appellant under his assignments of error. The first question is: Did the trial court commit reversible error in refusing to enter judgment permitting appellant, a minor, to disaffirm the purchase of the car involved in this case and obtain the return of the purchase price?

On this question, we are of the opinion that it cannot be said the facts preponderate against findings Nos. 3 and 4, and we are further of the opinion such findings support the judgment in so far as Mr. Lubin's claimed disaffirmance of the contract is concerned.

It may be stated as a general rule that an infant's contract may be avoided upon his reaching majority or during his minority. 27 Am. Jur. 773, § 38.

There are many questions with respect to the avoidance of infants' contracts, such as questions relating to the person who may avoid, the time and mode of avoidance, the conclusiveness and effect of avoidance, the return of considera-

tion furnished by or to the infant, and estoppel to avoid the contract. 27 Am. Jur. 771, 772, § 33.

Our own statutes provide:

Rem. Rev. Stat., § 5829 [P.P.C. § 357-1]: "A minor is bound, not only by contracts for necessaries, but also by his other contracts, unless he disaffirms them within a reasonable time after he attains his majority, and restores to the other party all money and property received by him by virtue of the contract, and remaining within his control at any time after his attaining his majority."

Rem. Rev. Stat., § 5830 [P.P.C. § 357-3]: "No contract can be thus disaffirmed in cases where, on account of the minor's own misrepresentations as to his majority, or from his having engaged in business as an adult, the other party had good reasons to believe the minor capable of contracting."

In *Thosath v. Transport Motor Co.,* 136 Wash. 565, 240 Pac. 921, in referring to the statute last above quoted, we stated:

"It must be noted that the statute dealing with such cases contains two alternatives: the first, 'no contract can thus be disaffirmed in cases where, on account of the minor's own misrepresentations as to his majority,' and second, '*or from his having engaged in business as an adult;*' the statute then continuing by providing that, *in either such case,* the other party has good reason to believe the minor capable of contracting." (Italics ours.)

The opinion continues:

"In the *Gill* case, *supra* [*Gill v. Parry,* 114 Wash. 19, 194 Pac. 797], the second alternative for estoppel precluding the minor from disaffirming his contract existed, even conceding the truth of his own testimony that he told the other party that he was *not* of age. In this case, the first ground of estoppel existed, by undisputed and incontrovertible evidence—that of the written statement of the minor that he was twenty-two years of age."

In the instant case, we are concerned only with the first ground of estoppel.

In the instant case, as in the *Thosath* case, *supra,* the minor signed a written statement that he was twenty-one

years of age or over. The trial court so found (finding No. 4).

In *Stone v. Knutzen,* 147 Wash. 54, 265 Pac. 161, the opinion states that the trial court found that the minor appeared to be more than twenty-one years of age; that at the time of trial he appeared to be at least twenty-five years of age. While there are facts in the *Stone* case not in the instant case, we have referred to the above finding by the trial court in the *Stone* case for the purpose of showing the importance this court has attached to the appearance of the minor when considered in connection with his representation as to his age. We quote from the *Stone* case:

"There is abundant evidence in the record to sustain the court's findings of fact. *The trial court saw the appellant* and was in far better position to state whether or not his representations as to his age [in the cited case apparently oral representation], taken in conjunction with his appearance generally, were calculated to induce in the mind of the respondent the belief that appellant was capable of contracting on his own account." (Italics ours.)

The *Stone* case also quotes from *Gill v. Parry,* 114 Wash. 19, 194 Pac. 797:

" 'While it is the general rule that infants may avoid their contracts, our statute has considerably mellowed the rigorous common law rules in this regard. . . . the court expressly found that all the defendants believed that Gill was capable of making a contract. There was ample proof to support these findings, and we will not interfere with them.' "

The opinion in the *Stone* case concludes as follows:

"So in this case, there is involved nothing but questions of fact, and all essential facts have been found against the appellant by the trial court.
"The judgment will be affirmed."

Appellant herein cited and particularly relies on the case of *Snodderly v. Brotherton,* 173 Wash. 86, 21 P. (2d) 1036. This was an action in replevin, tried to the court. We think the following statements, found in the opinion, sufficient to show the cited case is not controlling herein.

"There is not a syllable of testimony nor a shred of evidence in the record that respondent actually misrepresented his age. We may, therefore, disregard that element. Whether respondent's former business activities and enterprises were such as to lead one generally to believe him capable of contracting, is immaterial in this case, because the court, in its memorandum opinion and also in its findings of fact, *specifically found that Stradley, the agent of appellant,* knew that respondent was not then of age." (Italics ours.)

■ We are satisfied that in the instant case the facts support the finding:

"That on said 30th day of September, 1944, and at the time of the trial said Daniel J. Lubin appeared to be of an age of from 25 to 26 years; that at no time prior to December 23, 1944, did said Daniel J. Lubin advise defendants, or either of them, that he was a minor; that by said written statement, by his appearance, by his conduct, and by his method and manner of doing business with defendants, said Daniel J. Lubin represented himself to defendants to be of full legal age; that said defendants had good reason to believe that said Daniel J. Lubin was of full age and capable of contracting."

We are further satisfied that, based upon the facts found, the trial court was justified in refusing to permit the minor to disaffirm his contract, and in refusing to direct a return of the purchase price.

■ It is next contended that the court erred in refusing to enter judgment for appellant on his second cause of action, wherein he alleged that respondents misrepresented that Babcock Motors was the owner of the full unencumbered legal title to the automobile.

We, like the trial court, are of the opinion there is no merit to this contention, and we are of the opinion the facts as herein stated fully justified finding of fact No. 5 as made by the court and set out herein.

■ Appellant's last contention is that the court erred in admitting defendants' exhibit No. 7, which consisted of a statement of labor and material furnished by Babcock Motors in repairing the car, with the charges made therefor. This statement, or bill, was signed by Daniel Lubin. In-

cluded in the claimed error is the further contention that the court erred in permitting Mr. Cowell to testify as to the cause of repairs.

Exhibit No. 7 was identified by Mr. Lubin during his cross-examination, and was offered in evidence by counsel for respondents. At the time this exhibit was offered, Mr. Hamblen, counsel for respondents, asked if there was any objection to its introduction, to which Mr. Swerland, counsel for appellant, answered "No." In view of the condition of the record, as stated, we are unable to see any basis for appellant's contention that exhibit No. 7 was admitted over the objection of appellant; to the contrary, counsel for appellant expressly stated he had no objection to its introduction. It is true that, subsequent to the admission of the exhibit, and during the further cross-examination of Mr. Lubin, he was asked by Mr. Hamblen: "Q. What figures were there when you signed the order? A. As far as I recall, no figures were there."

At this point, Mr. Swerland objected to the introduction of the exhibit because it was not in the same condition as when Lubin signed it. The objection was overruled. Of course, the objection as made was not a proper objection, as the exhibit had been admitted.

■ However, we are satisfied the court committed no prejudicial error in admitting exhibit No. 7, even had a proper objection been made, because Mr. Lubin later admitted that he signed the order for repairs after the car had been repaired, at which time the evidence of Mr. Cowell showed that all the figures were on the order. It also later appears in Mr. Lubin's testimony, when asked by his own counsel whether or not the figures were on the order when he signed it, his answer was "I can't recall."

■ We are also of the opinion the court committed no error in permitting Mr. Cowell to testify relative to the repairs made upon the car. The record shows that Mr. Cowell was asked:

"Q. Well, now, Mr. Cowell, when did you next hear from Mr. Lubin? A. The exact date I don't recall. I think it was

approximately September 14th, or about the time of this order. Q. You mean December? A. December. I beg your pardon. About the time that this order was dated Mr. Lubin came into our place of business with the car and had had this trouble, which was caused by excess speed. Q. What was the trouble? MR. SWERLAND: Just a moment, your Honor. I object to that unless the witness will be qualified and explains how he knows the cause of the trouble. THE COURT: I assume he is going to. First, you had better tell what the trouble was."

The witness then proceeded to tell what they found to be the trouble, after dropping the crankcase, and what was found to be necessary to be done to repair the car. As hereinbefore stated, no objection was made to any of this testimony. Mr. Cowell also testified that Mr. Lubin told him that on the way back to his camp he got in a hurry and "opened it up." After all the testimony relative to the repairs was in, Mr. Swerland stated:

"Just a minute, your Honor. I haven't objected right along, your Honor, but the witness has indulged in remarks that have no bearing on the issues in this case and I request the court to instruct him to answer the questions."

No authority is cited by appellant on this question, and we are of the opinion that, if there was any merit to appellant's original objection, the effect of his objection was lost when he made no further objection to any of the subsequent testimony. Further, we are satisfied that, from Mr. Lubin's statement to him and from the condition in which the motor was found when the crankcase was removed, Mr. Cowell knew what the trouble with the motor was.

We conclude the court committed no prejudicial error in admitting defendants' exhibit No. 7, nor in permitting Mr. Cowell to testify.

What we have heretofore said relative to the right of Mr. Lubin to disaffirm the contract of sale because of his being a minor, applies to the repair bill.

█ May we say in conclusion that the law intends the privilege of infancy simply as a shield to protect the infant from injustice and wrong, and not as a sword to be used to the injury of others. We are clearly of the opinion that,

under all the facts in this case, to permit Daniel Lubin to prevail would be to permit his infancy to be used as a sword to the injury of respondents.

The judgment of the trial court is affirmed.

BEALS, C. J., STEINERT, BLAKE, and ROBINSON, JJ., concur.